UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

VLADIMIR ZUK, also known as WALTER ZUK

                Plaintiff,

v.                                         5:07-CV-732
                                         (GTS/GJD)

ONONDAGA COUNTY; KEVIN E. WALSH,
Sheriff, Onondaga County, in his Official Capacity;
and ESTEBAN GONZALEZ, Captain, Onondaga
County Justice Center, in his Official Capacity,

                Defendants.

_____

APPEARANCES:                              OF COUNSEL:

VLADIMIR ZUK
  Plaintiff, *Pro Se*
P.O. Box 65
Camillus, NY 13031

GORDON J. CUFFY                         KAREN A. BLESKOSKI, ESQ.
Onondaga County Attorney                 Deputy County Attorney
  Counsel for Defendants
421 Montgomery Street
Syracuse, NY 13202

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this *pro se* civil rights action, filed by Vladimir Zuk

("Plaintiff") against Onondaga County, Onondaga County Sheriff Kevin E. Walsh, and

Onondaga County Undersheriff Esteban Gonzalez ("Defendants"), is Defendants' motion for

summary judgment.  (Dkt. No. 59)  For the reasons set forth below, Defendants' motion is

granted, and Plaintiff's Second-Amended Complaint is dismissed with prejudice.

## TABLE OF CONTENTS

I.      RELEVANT BACKGROUND..............................................................................3
        A.      Plaintiff's Claims.................................................................................3
        B.      Defendants' Motion for Summary Judgment..................................5
        C.      Plaintiff's Cross-Motion to File a Third-Amended Complaint...........................7

II.     RELEVANT LEGAL STANDARDS..........................................................7
        A.      Motion for Summary Judgment.........................................................7
        B.      Motion to File an Amended Complaint............................................9

III.    UNDISPUTED MATERIAL FACTS.........................................................10
        A.      Overview of OCSO Policies and Procedures................................10
        B.      Plaintiff's Employment at OCSO....................................................16
        C.      Plaintiff's Work-Related Concerns.................................................19
        D.      Plaintiff's Lack of Promotion..........................................................22
        E.      Plaintiff's Grievances......................................................................24

IV.     ANALYSIS
        A.      Plaintiff's Claim of National-Origin Discrimination Under Title VII
                Due to Issuance of Reprimand and Denial of Promotion.......................26
        B.      Plaintiff's Claim of Hostile Work Environment Under Title VII Due
                to Verbal Harassment.......................................................................35
        C.      Plaintiff's Claim of Retaliation Under Title VII Due to Issuance of
                Reprimand and Denial of Promotion...............................................38
        D.      Plaintiff's Claim of Denial of Right to Free Speech Under
                42 U.S.C. § 1983 and First Amendment..........................................44
        E.      Plaintiff's Cross-Motion to File a Third-Amended Complaint...........................46

I.      **RELEVANT BACKGROUND**

A.      **Plaintiff's Claims**

Plaintiff's Second-Amended Complaint asserted nine causes of action against

Defendants.  (Dkt. No. 35.)  However, on July 22, 2008, the Honorable David N. Hurd issued a

Decision and Order dismissing the following causes of action from that Second-Amended

Complaint: (1) Plaintiff's claim pursuant to the Age Discrimination in Employment Act for

failure to file a timely complaint with Equal Employment Opportunity Commission ("EEOC");

and (2) Plaintiff's claims under the New York State Executive Law for failure to file a timely

Notice of Claim.  (Dkt. No. 49.)  In addition, Judge Hurd dismissed Plaintiff's claims against

Defendant Walsh as Joint Public Employer, as well as Plaintiff's claim for punitive damages.

(*Id.*)  As a result, the current Decision and Order address only those portions of Plaintiff's

Second-Amended Complaint that survive Judge Hurd's Decision and Order of July 22, 2008.

Construed with the utmost of special leniency, the surviving portions of Plaintiff's

Second-Amended Complaint alleges that, between 2003 and 2007, Defendants violated his civil

rights under 42 U.S.C. §§ 1981, 1983, and 2000e, while he was working as a deputy in the

Onondaga County Sheriff's Office ("OCSO") Custody Department, by disciplining him and

denying him promotional opportunities.  (Dkt. No. 35.)  More specifically, Plaintiff, a

naturalized citizen born in Brazil, claims as follows: (1) Defendants discriminated against him

based on his national origin, in violation of 42 U.S.C. § 2000e (hereinafter "Title VII"), by

issuing him an unjustified written reprimand (for failing to submit his time sheets) and by

wrongfully denying him a promotion to Deputy-Sheriff Sergeant on ten separate occasions; (2)

Defendants subjected him to a hostile work environment, in violation of Title VII, by verbally

harassing him, or permitting him to be verbally harassed, on multiple occasions;  (3) Defendants

retaliated against him, in violation of Title VII, by issuing him an unjustified written reprimand

and by wrongfully denying him a promotion to Deputy-Sheriff Sergeant; and (4) Defendant

Gonzalez unjustifiably suppressed his speech, in violation of 42 U.S.C. § 1983 and the First

Amendment.  (*Id.*)

      The Court notes that it cannot, even with the utmost of special leniency, construe

Plaintiff's Second-Amended Complaint as asserting a cause of action under the Due Process

Clause of the Fourteenth Amendment, because a civil servant does not have a property interest in

being promoted.  *McMenemy v. City of Rochester*, 241 F.3d 279, 286 (2d Cir. 2001).  Nor can

the Court, even with the utmost of special leniency, construe Plaintiff's Second-Amended

Complaint as asserting a cause of action under the Equal Protection Clause of the Fourteenth

Amendment, because (1) he has failed to allege facts plausibly suggesting that (1) he was treated

differently from other similarly situated individuals, and (2) any such disparate treatment was

based on impermissible considerations such as national origin, or intent to inhibit or punish the

exercise of constitutional rights.[1]

---

[1]    "The Equal Protection Clause requires that the government treat all similarly
situated people alike."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).
"To prevail on a claim of selective enforcement, plaintiffs in this Circuit traditionally have been
required to show both (1) that they were treated differently from other similarly situated
individuals, and (2) that such differential treatment was based on impermissible considerations
such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious
or bad faith intent to injure a person."  *Harlen Assocs.*, 273 F.3d at 499 (internal quotation marks
and citations omitted).  In other words, "a plaintiff must 'prove purposeful discrimination
directed at an identifiable or suspect class.'"  *Spavone v. City of New York*, 420 F. Supp.2d 236,
240 (S.D.N.Y. 2005) (quoting *Hart v. Westchester County Dep't of Soc. Servs.*, 160 F. Supp.2d
570, 578 [S.D.N.Y. 2001]); *see also Essen v. Bd. of Educ. of the Ithaca City Sch. Dist.*,
92-CV-1164, 1996 WL 191948, at *9 (N.D.N.Y. Apr. 15, 1996) (Scullin, J.) ("[A]bsent a
showing that the [d]istrict's policies served to discriminate against a particular class of disabled
students, no equal protection cause of action exists.").

### B.      Defendants' Motion for Summary Judgment

On March 3, 2009, Defendants filed a motion for summary judgment. (Dkt. No. 59, Attach. 95.) Included among their motion papers was a Rule 7.1 Statement of Material Facts that set forth, in 181 numbered paragraphs, each material fact about which Defendants contend there exists no genuine dispute, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court. (Dkt. No. 59, Attach. 5 [Defs.' Rule 7.1 Stmt.].)

Also included among their motion papers was a memorandum of law advancing the following seven arguments in support of their motion for summary judgment: (1) the claims against Kevin E. Walsh and Esteban Gonzalez, in their official capacity, should be dismissed because a suit against a municipal officer in his official capacity is functionally equivalent to a suit against the entity of which the officer is an agent; (2) Plaintiff failed to exhaust the mandatory administrative remedies before instituting this action in federal court, and therefore his Second-Amended Complaint should be dismissed; (3) Plaintiff's claims pursuant to Title VII are barred by the applicable statute of limitations, and therefore these claims should be dismissed; (4) Plaintiff has failed to adduce admissible record evidence establishing a cause of action for national-origin discrimination, and therefore this claim should be dismissed; (5) Plaintiff has failed to adduce admissible record evidence establishing a cause of action for retaliation under Title VII, and therefore this claim should be dismissed; (6) Plaintiff has failed to adduce admissible record evidence establishing a hostile work environment, and therefore this claim should be dismissed; and (7) Plaintiff has failed to adduce admissible record evidence establishing a cause of action for a violation of his right to free speech under the First Amendment, and therefore this claim should be dismissed. (Dkt. No. 59, Attach 95.)

5

On June 4, 2009, Plaintiff filed a response to Defendants' motion for summary judgment. (Dkt. No. 60.)  Although Plaintiff generally complied with the requirements of Local Rule 7.1(a)(3), he included several qualifying statements in his responses.  The Court notes that, although such qualifying statements are common practice in this jurisdiction, in many of Plaintiff's qualifying statements, he asserts additional facts.[2]  This is improper.  *See* N.D.N.Y. L.R. 7.1(a)(3) (noting that, when the non-movant chooses to allege additional facts that are in dispute, the non-movant must "set forth [these] additional facts . . . in *separately numbered paragraphs*") (emphasis added).

"[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment."  *Viscusi v. Proctor & Gamble*, 05-CV-1528, 2007 WL 2071546, at *9 (E.D.N.Y. July 16, 2007).  This includes complying with the procedural formalities of Local Rules, including Local Rule 7.1(a)(3).  *Krug v. County of Rennselaer*, 559 F. Supp.2d 223, 235 n.6 (N.D.N.Y. 2008) (McAvoy, J.) (noting that "[t]he responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly").[3]  As a result, while the Court will not turn a blind eye to material facts asserted by Plaintiff that are clearly not in dispute, the Court also declines to *sua sponte* comb through the 1,542 pages of exhibits that Plaintiff has attached in an effort to verify the asserted material facts, which Defendants were unable to admit or deny (based on Plaintiff's failure to comply with Local Rule 7.1).

---

[2]     (*See*, *e.g.*, Dkt. No. 60, Attach. 1, at ¶¶ 34, 43, 45, 57, 60.)

[3]     *See also Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. 2003) (Sharpe, M.J.); *see also Faretta v. California*, 95 S.Ct. 2525, 2541, n. 46 (1975) ("The right of self-representation is not a license . . . not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS*, 59 F.3d 5, 8 (2nd Cir. 1995) ("While a *pro se* litigant's pleadings must be construed liberally, . . . *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

### C.  Plaintiff's Motion to File a Third-Amended Complaint

In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff states that he "planned to use the Fourteenth Amendment to assert [a] § 1983 policy and practice claim against Onondaga County" (specifically of denying individuals their due process and equal protection rights), but was denied permission to do so by Magistrate Judge Peebles. (Dkt. No. 60, at 32.)  As a result, Plaintiff requests that the Court afford him an opportunity to amend his Second-Amended Complaint so as to assert this claim.  (*Id*. at 34.)  Out of special solicitude to Plaintiff, the Court will liberally construe this request as a motion to file a Third-Amended Complaint.

## II.  RELEVANT LEGAL STANDARDS

### A.  Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial."  Fed. R. Civ. P. 56(e)(2).

7

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party."  *Anderson*, 477 U.S. at 248.  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]; *see also* Fed. R. Civ. P. 56(e)(2).  As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." [citations omitted].  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[4]  For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement[5]–even where the nonmoving party was a plaintiff in a civil rights case.[6]

---

[4]    *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) [citations omitted]; *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

[5]    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the

**B.      Motion to Amend a Complaint**

A motion to amend a complaint is made pursuant to Fed. R. Civ. P. 15, which provides

that leave to amend "should [be] freely give[n] . . . when justice so requires."  Fed. R. Civ. Proc.

15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manson v. Stacescu*, 11 F.3rd 1127, 1133

(2d Cir. 1993).  Elaborating on this standard, the Supreme Court has explained:

> In the absence of any apparent or declared reason–such as undue
> delay, bad faith or dilatory motive on the part of the movant, repeated
> failure to cure deficiencies by amendments previously allowed, undue
> prejudice to the opposing party by virtue of allowance of the
> amendment, futility of amendment, etc.–the leave sought should . . . be
> 'freely given.'

*Foman*, 371 U.S. at 182, *accord*, *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.

2001) ("[Leave to amend] should not be denied unless there is evidence of undue delay, bad

faith, undue prejudice to the non-movant, or futility.").

---

moving party's factual assertions in matching numbered paragraphs, and supports any denials
with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

    [6]      *See, e.g.*, *Hassig v. N.Y.S. Dep't of Envtl. Conservation*, 01-CV-0284, Decision
and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd*, No. 04-1773, 2005 WL
290210 (2d Cir. Feb. 2, 2005); *Lee*, 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd*, No. 04-
1921, 2004 U.S. App. LEXIS 21432; *Harvey v. Morabito*, 99-CV-1913, 2003 WL 21402561, at
*1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3
(N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd*, No. 04-1008, 115 F. App'x 521 (2d Cir. Dec.
23, 2004); *Krug*, 2006 WL 2669122, at *2-3; *Fox*, 2006 U.S. Dist. LEXIS 9147, at *2-3;
*Singleton v. Caron*, 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles,
M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.);
*Govan*, 289 F. Supp.2d at 295; *Butler v. Weissman*, 00-CV-1240, 2002 WL 31309347, at *3
(N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2
(N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.*, 49 F. Supp.2d 84, 86
& n.1 (N.D.N.Y. 1999) (McAvoy, C.J.); *Costello v. Norton*, 96-CV-1634, 1998 WL 743710, at
*1 n.2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.*, 96-CV-
1812, 1998 WL 566773, at *1 n.2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v.
N.Y. City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing, in *pro se* civil rights case,
district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its
business").

III.    **UNDISPUTED MATERIAL FACTS**

Before the Court recites the undisputed material facts, one point bears mentioning.  In his

Amended Statement of Material Facts, Plaintiff admits (by "not disput[ing]") Paragraph 147 of

Defendants' Statement of Material Facts.  (Dkt. No. 72, at ¶ 147.)  However, in so doing,

Plaintiff also adds the following statement: "during a Federal Rules of Civil Procedure Rule 16

Conference [he] was informed that the Sheriff did not believe [he] would make a good

supervisor and that [he] would not be promoted."  (*Id*.)  This statement, which is not part of the

record,[7] is not something that the Court may consider in reviewing Defendants' motion for

summary judgment.  As a result, this statement, as well as any other that is based on discussions

that occurred during any scheduling conferences, is stricken from the record.  With this in mind,

the Court now turns to a recitation of the undisputed material facts.

A.      **Overview of OCSO Policies and Procedures**

OCSO employees are required to follow the policies and procedures governing employee

conduct, including, but not limited to, those set forth in the Onondaga County Employee

Handbook and the OCSO Duty Manual.  (*See generally* Dkt. No. 59, Attach. 5, at ¶¶ 1-42.)

These policies and procedures address a variety of work-related issues, including promotions,

disciplinary measures and procedures, and prohibited conduct such as discrimination, harassment

and retaliation.  (*Id*.)  Furthermore, the OCSO often issues written directives regarding, among

other things, promotions, the submission of time sheets, the documentation of employee

---

[7]      *See* N.D.N.Y. L.R. 7.1(a)(3) (noting that each material fact listed "shall set forth a specific citation to the record where the fact is established[, and] [t]he record for purposes of the Statement of Material Facts includes *pleadings, depositions, answers to interrogatories, admissions and affidavits*") (emphasis added).

performance, harassment and retaliation, and disciplinary procedures.  (*Id.*)[8]

### 1.    Promotions of OCSO Employees

Promotions of OCSO Custody Department deputies are governed by a multi-phased process.  (*Compare* Dkt. No. 59, Part 5, at ¶ 3 *with* Dkt. No. 72, at ¶ 3 [Plf.'s Rule 7.1 Resp.].)  First, to become eligible for promotion, candidates must pass the relevant civil service examination administered pursuant to New York State Civil Service Law.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 4 *with* Dkt. No. 72, at ¶ 4.)  A list of the candidates eligible is then compiled according to their respective scores on the examination.  (*Id.*)  Candidates from the eligible list scoring higher than, or equal to, the third highest score on the examination may be considered for promotion.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 5 *with* Dkt. No. 72, at ¶ 5.)  *See also* N.Y. CIV. SERV. § 61(1).

In choosing among those that satisfy the threshold qualifications, a panel of OCSO supervisors ("promotion panel") convenes and conducts interviews.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 5 *with* Dkt. No. 72, at ¶ 5.)[9]  Generally, during the interview, the promotion panel asks questions concerning issues and hypothetical scenarios germane to the particular position.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 21 *with* Dkt. No. 72, at ¶ 21; *see also* Dkt. No. 59, Attach.

---

[8]    Compliance with written directives issued pursuant to the authority of the Onondaga County Sheriff is mandatory under the OCSO Duty Manual.  (*See* Dkt. No. 59, Attach. 29, at 5, Part 1.1 [Ex. R to Defs.' Rule 7.1 Stmt., attaching relevant portions of the OCSO Duty Manual, which notes that employees are to follow, among other things, orders and directives].)

[9]    Being on the list of candidates eligible for promotion is not a guarantee that a candidate will be promoted.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 6 *with* Dkt. No. 72, at ¶ 6; *see also Hatala v. McCaul*, 677 N.Y.S.2d 564 (N.Y. App. Div., 1st Dept. 1998) (noting that the use of of interviews to determine which eligible candidate would be promoted was well within the authorization of Civil Service Law).

11, 12 [Sergeant's Promotional Review Board Forms].)[10]  In addition, the promotion panel

reviews and considers a candidate's disciplinary history, personnel file,[11] and supervisor's

memorandum file.[12]  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 8, 15-20 *with* Dkt. No. 72, at ¶¶ 8,

15-20.)

        After completing the interview, each promotion panel member scores the candidates.

(*Compare* Dkt. No. 59, Attach. 5, at ¶ 22 *with* Dkt. No. 72, at ¶ 22.)[13]  Those individual scores

are then tallied, and each candidate is ranked accordingly.  (*Id.*)[14]  The list ranking each

---

        [10]        The updated 2007 promotional review board form (Dkt. No. 59, Attach. 12),
unlike its 2003 predecessor (Dkt. No. 59, Attach. 11), does not allow a promotion panel to
deduct points based on discipline or information contained in a candidate's personnel file or
supervisor's memorandum file.

        [11]        OCSO Human Resources Division maintains the personnel files of its employees.
Each personnel file is multi-sectioned and is broken down into the following separate categories:
(1) payroll issues and insurance forms; (2) personal information including employment
application, birth certificate, driver's license, Social Security card, fingerprint card, and military
records; (3) supervisory evaluations; (4) education; (5) discipline; and (6) miscellaneous.
(*Compare* Dkt. No. 59, Attach. 5, at ¶ 13 *with* Dkt. No. 72, at ¶ 13.)

        [12]        The supervisor's memorandum file is maintained by department commanders, and
contains an employee's supervisor's memorandum.  (Dkt. No. 59, Attach. 7, at 6, 43-44.)
Supervisor's memorandums are forms used by a supervisor to document discussions with
employees about performance.  (*Id.*)  "The form may be used to highlight outstanding
performance in an area or may be used as a training tool to document discussion regarding
corrective actions for problem behavior."  (Dkt. No. 59, Attach. 9, at 23.) Supervisor's
memorandums do not have an expiration date.  (Dkt. No. 59, Attach. 9, at 23.)  However, the
Court notes that the supervisor who issues the supervisor's memorandum may keep it in the file
as long as he or she sees fit.  (*Id.* at 25-26.)

        [13]        It is unclear whether the scores remain attached to a particular candidate until the
expiration of the applicable civil service examination.  Thus, construing the record in the light
most favorable to the non-movant, the Court finds, for purposes of deciding Defendants' motion
for summary judgment, that Plaintiff's ranking by the promotion panel (as well as the ranking of
all other candidates), remained unchanged until the expiration of the applicable civil service
examination.

        [14]        The Court notes that Defendant has not provided Plaintiff with any documentation
showing the promotion panel's ranking of Plaintiff, nor the promotion panel's ranking of those
awarded the promotion.  (Dkt. No. 60, Attach. 55, 25, at ¶ 19 [Defendant Walsh Interrogatories]

candidate, along with the recommendations of the promotion panel, is then submitted to

Defendant Walsh, who ultimately decides which candidate will be promoted.  (*Compare* Dkt.

No. 59, Attach. 5, at ¶¶ 23, 24 *with* Dkt. No. 72, at ¶¶ 23, 24.)[15]  Those candidates not selected

for promotion are given the opportunity to speak with a promotion panel member about ways to

improve.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 25 *with* Dkt. No. 72, at ¶ 25.)

> ### 2.      Submission of Time Sheets

County employees are required to account for the time they work by submitting time

sheets.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 57 *with* Dkt. No. 72, at ¶ 57.)[16]  Since 1970, the

OCSO has maintained a policy requiring that time sheets be submitted for approval at the end of

each two week pay period.  (*Id.*)

The OCSO has repeatedly stressed the importance of the timely submission of time

sheets.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 60, 74 *with* Dkt. No. 72, at ¶¶ 60, 74.)[17]  Between

---

["[N]o documents which were known to be relevant to this litigation have been destroyed since the onset of litigation. . . . Any documents which may no longer exist were disposed of in the normal course of business prior to Defendants' knowledge of this litigation."].)

[15]      According to the record, Defendant Walsh seeks to promote those individuals best suited to supervise their colleagues.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 6 *with* Dkt. No. 72, at ¶ 6.)  A candidate suited for a promotion to a supervisory position should possess qualities including, but not limited to, communication skills and flexibility in making decisions. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 7 *with* Dkt. No. 72, at ¶ 7.)  The Court notes, however, that Defendant Walsh generally promotes those recommended by the promotion panel.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 24 *with* Dkt. No. 72, at ¶ 24.)

[16]      OCSO deputies are paid according to the time logged on their time sheets. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 58 *with* Dkt. No. 72, at ¶ 58.)  Those time sheets are also used to calculate overtime pay, sick leave, personal time, and vacations.  (*Id.*)

[17]      On June 29, 2004, and July 14, 2004, OCSO Custody Department Chief Callisto requested that supervisor's memorandums be issued and/or formal discipline be sought for employees whose names were on a list of OCSO Custody Department personnel who had not submitted time sheets.  (*See* Dkt. No. 59, Attach. 32 [email chain from Chief Callisto, dated June 29, 2004, and July 14, 2004].)  Chief Callisto also requested that the time sheets be completed immediately.  (*Id.*)  Similar requests were made on September 23, 2004, and August 2, 2005.

2003 and 2005, around eighteen (18) supervisor's memorandums were issued to employees who failed to timely submit their time sheets.  (Dkt. No. 59, Attach. 5, at ¶ 72; Dkt. No. 59, Attach. 52.)[18]  In addition, on September 2, 2004, Defendant Walsh further stressed the importance of complying with this policy by issuing a written directive, which required "[a]ll OCSO personnel . . . to submit [time sheets to their supervisor] on the last day of the pay period."  (Dkt. No. 59, Attach. 53.)

### 3.     Policies and Procedures Regarding Discrimination, Harassment and Retaliation

National-origin discrimination and harassment, and other such discrimination and harassment, is prohibited by OCSO policy.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 42 *with* Dkt. No. 72, at ¶ 42.)[19]  Generally, the OCSO defines national-origin harassment as "ethnic slurs, ethnic jokes or other intimidating, hostile or offensive verbal or physical conduct relating to a person's race or national origin," and harassment as "unwelcome physical or verbal actions . . . ."  (Dkt. No. 59, Attach. 19, at 3 [Relevant Portions of the Onondaga County Employee Handbook]; Dkt. No. 59, Attach. 25, at 2 [OCSO Written Directive Regarding Harassment].)

The OCSO maintains internal procedures for aggrieved employees to seek redress for such discrimination and harassment.  (Dkt. No. 59, Attach. 21-25.)  The internal complaint procedure does not, however, interfere with an aggrieved employee's right to file complaints

---

(*See* Dkt. No. 59, Attach. 33 [email chain from Chief Callisto, dated Sept. 23, 2004], 34 [email chain from Chief Callisto, dated Aug. 2, 2005].)

[18]    Generally, the supervisor's memorandums identified the recipient's failure to submit his or her time sheets in a timely manner, and noted that a continuation of such conduct would result in progressive discipline.  (Dkt. No. 59, Attach. 52.)

[19]    This policy is codified in both the Employee Handbook and the OCSO Duty Manual, and has been stressed in several written directives.

with the New York State Division of Human Rights or with the EEOC.  (Dkt. No. 59, Attach. 20 [Harassment and Anti-Retaliation Policy], 21 [Onondaga County Discrimination/Harassment and Anti-Retaliation Complaint Policy].)

In addition to these policies, the OCSO also maintains an anti-retaliation policy. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 42 *with* Dkt. No. 72, at ¶ 42.)  This policy prohibits adverse action against employees complaining of, or involved with proceedings concerning, workplace harassment.  (Dkt. No. 59, Attach. 20, 21, 25.)

### 4.    Disciplinary Measures and Procedures

OCSO disciplinary measures and procedures are governed by a multi-phased process. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 30 *with* Dkt. No. 72, at ¶ 30.)  The disciplinary process begins with a supervisor documenting his or her determination that an employee violated the OCSO Duty Manual.  (*Id.*)  The matter is then forwarded through several channels for an investigation and determination of whether disciplinary measures are warranted.  (*Id.*)[20]

In the event disciplinary action is sought, a due process hearing date is scheduled according to the availability of the Undersheriff, the department chief, the employee and his union representative, the Human Resources manager, and any other necessary personnel. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 33 *with* Dkt. No. 72, at ¶ 33.)  At the due process hearing,

---

[20]    After a supervisor documents a violation, the matter is forwarded to the employee's department commander.  The department commander then decides whether the matter should be forwarded to the Professional Standards Unit ("PSU") for a complete investigation.  Once forwarded, PSU compiles a factual report based on the investigation, and forwards that report to the Onondaga County Undersheriff, who determines whether progressive discipline is warranted.  If the Undersheriff finds that progressive discipline is warranted, the matter is then referred to the department chiefs for their recommendations as to whether discipline is warranted and, if so, what penalty, if any, should be imposed.  The department chiefs then return the matter and their recommendations to the Undersheriff who, after reviewing the information, confers with the Sheriff for ultimate determination.  (Dkt. No. 59, Attach. 5, at ¶ 30.)

the employee is presented with the Notice and Specification of Charges and explained his or her

rights under the Collective Bargaining Agreement should the employee choose to oppose the

disciplinary action.[21]  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 34 *with* Dkt. No. 72, at ¶ 34.)

### B.    Plaintiff's Employment at OCSO

Plaintiff has been employed by the OCSO as a Deputy-Sheriff since February of 1997.

(*Compare* Dkt. No. 59, Attach. 5, at ¶ 54 *with* Dkt. No. 72, at ¶ 54.)  On more than one occasion

during his employment, Plaintiff has engaged in conduct found to be in violation of OCSO

policies and procedures.  (*See generally* Dkt. No. 59, Attach. 5.)  More specifically, on

November 14, 2003, Plaintiff was issued a supervisor's memorandum for his repeated failure to

observe OCSO policies regarding the submission of time sheets, and, on February 15, 2005,

Plaintiff received a written reprimand for his continued failure to observe these policies.

(*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 59-69 *with* Dkt. No. 72, at ¶¶ 59-69.)  In addition, on July

26, 2006, Plaintiff was issued a supervisor's memorandum for engaging in conduct found to be

unprofessional and offensive.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 107 *with* Dkt. No. 72, at ¶

107.)

### 1.    Plaintiff's Submission of Time Sheets

Plaintiff failed to timely submit time sheets for two consecutive pay periods in September

and October of 2003.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 59 *with* Dkt. No. 72, at ¶ 59; *see*

---

[21]    If an employee opposes disciplinary action, he or she has the option of seeking a hearing, pursuant to Civil Service Law § 75, or binding arbitration.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 39 *with* Dkt. No. 72, at ¶ 39.)  Though Plaintiff disputes paragraph 39 of Defendants' Rule 7.1 Statement, the Court finds that Plaintiff's basis for his denial is erroneous. In particular, Civil Service Law §75(2) does not permit an immediate hearing if the employee requests representation.  Instead, the employee is afforded a reasonable amount of time to obtain representation before having to respond to questions at the hearing.  (Dkt. No. 60, Attach. 34, at 5 [Civil Service Law §75].)

*also* Dkt. No. 59, Attach. 31 [OCSO Supervisor's Memorandum].)  As a result, on November 14,
2003, Plaintiff received a supervisor's memorandum ordering that he comply with OCSO
policies regarding time sheets, and noting that similar conduct in the future will result in
progressive discipline.  (*Id.*)

In May and June of 2004, Plaintiff again failed to submit his time sheets.  (*Compare* Dkt.
No. 59, Attach. 5, at ¶ 61 *with* Dkt. No. 72, at ¶ 61; *see also* Dkt. No. 59, Attach. 36 [OCSO
Memorandum Requesting Progressive Discipline].)  On June 30, 2004, Sergeant Banks sent a
memo to Captain Albanese requesting progressive discipline for Plaintiff.  (*Compare* Dkt. No.
59, Attach. 5, at ¶ 61 *with* Dkt. No. 72, at ¶ 61.)  On December 27, 2004, Undersheriff Darby
recommended that Plaintiff receive a written reprimand.  (*Compare* Dkt. No. 59, Attach. 5, at ¶
64 *with* Dkt. No. 72, at ¶ 64.)  On February 15, 2005, Plaintiff was issued a written reprimand.
(*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 67-69 *with* Dkt. No. 72, at ¶¶ 67-69.)

Plaintiff objected to the written reprimand, filed a grievance regarding the reprimand, and
requested that the issue be decided by an arbitrator.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 70
*with* Dkt. No. 72, at ¶ 70.)  On August 25, 2005, the arbitrator held that the OCSO had just cause
to impose progressive discipline and denied the grievance.  (*Id.*; *see also* Dkt. No. 59, Attach. 47,
at 7 [Arbitration Award].)

### 2.    Plaintiff's Contact with Melody Holmes

On July 12, 2006, Plaintiff was delegated the responsibility of responding to an email
inquiry from the Director of Jail Ministry, Melody Holmes.  (*Compare* Dkt. No. 59, Attach. 5, at
¶¶ 90, 91 *with* Dkt. No. 72, at ¶¶ 90, 91.)[22]   Plaintiff was ordered to inform Ms. Holmes that her

---

[22]     Ms. Holmes requested that an inmate be transferred to the Clean and Sober Unit.
(Dkt. No. 59, Attach. 10, at 13.)

request could not be accommodated and provide an explanation as to why.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 92 *with* Dkt. No. 72, at ¶ 92.)

On July 18, 2006, Plaintiff sent Ms. Holmes a response email.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 93 *with* Dkt. No. 72, at ¶ 93.)[23]  Later that day, Ms. Holmes emailed Plaintiff seeking further clarification about his email.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 95 *with* Dkt. No. 72, at ¶ 95.)  Without consulting his superiors, Plaintiff responded to Ms. Holmes's email.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 96 *with* Dkt. No. 72, at ¶ 96.)  In that response, Plaintiff advised Ms. Holmes that the Jail Ministry's recommendations would be "given little consideration" and that its efforts would better be served by not becoming involved in the matter.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 97 *with* Dkt. No. 72, at ¶ 97.)  On July 19, 2006, Ms. Holmes sent an email to Plaintiff, Defendant Gonzalez, and Sergeant Powlina, which contained Plaintiff's response email from the previous day.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 98 *with* Dkt. No. 72, at ¶¶ 98.)  Gonzalez and Powlina found Plaintiff's email to be offensive and unprofessional.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 99, 100 *with* Dkt. No. 72, at ¶¶ 99, 100.)[24]

On July 26, 2006, Plaintiff was issued a supervisor's memorandum as a result of his email to Ms. Holmes.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 106 *with* Dkt. No. 72, at ¶ 106.)  Defendant Gonzalez directed that the memorandum be issued in order to correct conduct that he and others viewed as inappropriate.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 107 *with* Dkt. No. 72, at ¶ 107.)  In addition to the supervisor's memorandum, Plaintiff was ordered to refrain from

---

[23]     Plaintiff carbon copied one of his superiors as a recipient of this email.

[24]     Gonzalez also met with Sergeant Banks concerning Plaintiff's email, and he too agreed that the language used in the email was unprofessional.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 100 *with* Dkt. No. 72, at ¶ 100.)

contacting Ms. Holmes until the investigation was completed.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 110 *with* Dkt. No. 72, at ¶ 110.)

On August 4, 2006, Plaintiff filed a grievance over the supervisor's memorandum. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 111 *with* Dkt. No. 72, at ¶ 111.)  Although Plaintiff filed his grievance pursuant to Article 29 of the collective bargaining agreement, the grievance was dismissed because supervisor's memorandums are not a specific and express term of the agreement, and are thus not subject to the grievance procedure.  (*Id.*)

### C.    Plaintiff's Work-Related Concerns

#### 1.    Plaintiff's Wife

Plaintiff married fellow OCSO employee Theresa Zuk, formerly Theresa Spaulding, on August 21, 2004.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 175 *with* Dkt. No. 72, at ¶ 175.)  Ms. Zuk has been employed by the OCSO since 1994, and was promoted to Sergeant in December of 2000.  (Dkt. No. 59, Attach. 15, at 7.)  On more than one occasion during her career with the OCSO, Ms. Zuk has complained of gender harassment and discrimination.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 157-159, 167, 171-174 *with* Dkt. No. 72, at ¶¶ 157-159, 167, 171-174.)  In particular, between 1996 and 1997, Ms. Zuk filed written complaints regarding the treatment of female inmates at the Justice Center, as well as the treatment that she encountered as an employee of OCSO.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 157-163 *with* Dkt. No. 72, at ¶¶ 157-163.)[25]

_____

[25]    More specifically, on October 16, 1996, Ms. Zuk filed a written complaint concerning the manner in which female inmates were being treated at the Justice Center. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 157 *with* Dkt. No. 72, at ¶ 157.)  On December 13, 1996, Ms. Zuk filed a written complaint, alleging harassment at the hands of then-Sergeant Benjamin O'Dell, with the Onondaga County Personnel Department.  (*Compare* Dkt. No. 59, Attach. 5, at

In 2003, Ms. Zuk also accused a subordinate of violating OCSO policy, though her accusation was ultimately determined to be without merit. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 167, 168 *with* Dkt. No. 72, at ¶¶ 167, 168.)[26] Finally, in October 2003, Ms. Zuk filed complaints about another subordinate and the workplace environment.[27] (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 171-174 *with* Dkt. No. 72, at ¶¶ 171-174.)

---

¶¶ 157, 158 *with* Dkt. No. 72, at ¶¶ 157, 158.) On March 24, 1997, Ms. Zuk sent a letter to Defendant Walsh indicating that she was being subjected to harassment at the Justice Center. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 157 *with* Dkt. No. 72, at ¶ 157.) On May 15, 1997, Ms. Zuk filed a Human Rights Complaint concerning Sergeant O'Dell's harassing behavior. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 160 *with* Dkt. No. 72, at ¶ 160.) Ms. Zuk subsequently brought a lawsuit against Onondaga County concerning gender discrimination and harassment. (Dkt. No. 59, Attach. 15, at 40.) On September 8, 1997, Sergeant O'Dell was terminated because of several incidents of misconduct. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 160 *with* Dkt. No. 72, at ¶ 160.) Based on O'Dell's termination, Ms. Zuk discontinued her lawsuit and withdrew her Human Rights Complaint. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 162-163 *with* Dkt. No. 72, at ¶¶ 162-163.) On October 2, 2000, Deputy Veronica Casolare filed a federal lawsuit against the County of Onondaga and Sergeant O'Dell. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 164 *with* Dkt. No. 72, at ¶ 164.) Ms. Zuk was subpoenaed to testify in this lawsuit. (*Id.*) However, because the lawsuit was settled before trial, Ms. Zuk never testified. (*Id.*)

[26]     In 2003, Ms. Zuk reported to her supervisor that she smelled alcohol on a deputy's breath. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 167 *with* Dkt. No. 72, at ¶ 167.) The deputy denied having consumed any alcohol, which was confirmed by an Alco-Sensor test. (*Id.*) The deputy grieved having to submit to an Alco-Sensor test and proceeded to arbitration. (*Id.*) The arbitrator directed the County and the Sheriff to post a public apology. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 168 *with* Dkt. No. 72, at ¶ 168.) On March 10, 2005, Assistant Chief Wasilewski issued a public apology to the deputy. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 169 *with* Dkt. No. 72, at ¶ 169.) Ms. Zuk was not found to have acted inappropriately in handling the matter, and was not issued any form of discipline or supervisor's memorandum. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 170 *with* Dkt. No. 72, at ¶ 170.)

[27]     In October of 2003, Ms. Zuk filed a report about a deputy's comments to Ms. Zuk's sister that she wished Ms. Zuk would hang herself. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 171 *with* Dkt. No. 72, at ¶ 171.) That deputy was subsequently disciplined. (*Id.*) In November of 2003, Ms. Zuk complained to, then-Lieutenant Brisson that appropriately trained deputies were not being assigned to work in the booking unit for overtime shifts. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 173 *with* Dkt. No. 72, at ¶ 173.) Lieutenant Brisson advised Ms. Zuk that many of the deputies working overtime shifts refused to work in booking because they did not want to be under Ms. Zuk's supervision, and stated that several deputies noted that she was too quick to write them up. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 173-174 *with* Dkt. No. 72, at ¶¶ 173-174.)

### 2.     Ramadan

On September 22, 2006, Defendant Gonzalez issued a memorandum regarding meal times for inmates observing Ramadan.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 123 *with* Dkt. No. 72, at ¶ 123.)  Upon receipt of the memorandum, Plaintiff entered specific meal times for the list of inmates who declared themselves Muslim.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 125 *with* Dkt. No. 72, at ¶ 125.)  After seeking advice from others, Defendant Gonzalez decided that meal times should remain general.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 126 *with* Dkt. No. 72, at ¶ 126.)[28]  As a result, Plaintiff was directed to remove the assigned meal times from the list.

### 3.     Inmate Statistics

In 2006, Plaintiff was delegated the responsibility of compiling statistics regarding inmate population.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 130, 132 *with* Dkt. No. 72, at ¶¶ 130, 132.)  When it was time to file the 2006 annual report, some items were missing.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 134 *with* Dkt. No. 72, at ¶ 134.)  Plaintiff, who was on sick leave, received a telephone call from another deputy asking if he knew the whereabouts of the statistics. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 135-37 *with* Dkt. No. 72, at ¶¶ 135-137.)  After informing the deputy what he had done with the statistics, Plaintiff had no further communication with anyone regarding the statistics.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 137 *with* Dkt. No. 72, at ¶ 137.)

---

[28]     Though Plaintiff disputes this fact, the Court notes that Plaintiff does not controvert any of the substance of Defendants' assertion.  Rather, Plaintiff improperly circumvents Rule 7.1(a)(3) by asserting additional facts.  (*See supra* Part I.B. of this Decision and Order.)  Accordingly, the Court deems ¶ 126 admitted.

### D.       Plaintiff's Lack of Promotion

On or about February 7, 2005, Plaintiff became aware that he had passed civil service

examination number 77036, and was eligible for a promotion to the position of Deputy-Sheriff

Sergeant.  (Dkt. No. 59, Attach. 40 [Relevant Pages of Onondaga County Dept. of Personnel

Cert. of Eligibles, dated Feb. 7, 2005].)[29]  Plaintiff's interview was scheduled to occur on

February 16, 2005, the day after he was scheduled to have his disciplinary hearing concerning

his late submission of time sheets.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 67 *with* Dkt. No. 59,

Attach. 5, at ¶ 67.)[30]  On February 16, 2005, Plaintiff interviewed for the promotion.  (*Compare*

Dkt. No. 59, Attach. 5, at ¶ 75 *with* Dkt. No. 72, at ¶ 75.)  During the interview, along with the

other candidates, Plaintiff was asked about any supervisor's memorandums and prior discipline

received during his employment.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 78, 79 *with* Dkt. No.

72, at ¶¶ 78, 79.)  Plaintiff responded affirmatively and disclosed the 2004 written reprimand.

(*Compare* Dkt. No. 59, Attach. 5, at ¶ 79 *with* Dkt. No. 72, at ¶ 70.)  Plaintiff was not chosen for

the promotion.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 80 *with* Dkt. No. 72, at ¶ 80.)[31]

In August of 2005, another Deputy-Sheriff Sergeant position became available.

(*Compare* Dkt. No. 59, Attach. 5, at ¶ 81 *with* Dkt. No. 72, at ¶ 81.)  Again, Plaintiff was not

---

[29]       Plaintiff's score tied for third on the list of eligible candidates.  (Dkt. No. 59,
Attach. 40.)

[30]       At his disciplinary hearing, Plaintiff waived his right to an immediate due process
hearing and was presented with a written reprimand for the violations.  (*Compare* Dkt. No. 59,
Attach. 5, at ¶ 67 *with* Dkt. No. 59, Attach. 5, at ¶¶ 69-70.)  Plaintiff objected to the reprimand,
and chose to proceed to arbitration.  (*Id.*)

[31]       On February 26, 2005, Defendant Walsh promoted Deputy-Sheriff Joseph
Bernardini, who had the same examination score as Plaintiff.  (Dkt. No. 59, Attach. 40.)  Three
days earlier, on February 23, 2005, an arbitrator issued a decision requiring Defendant Walsh to
issue a public apology to the deputy whom Plaintiff's wife had accused of having alcohol in his
system during work.

selected for the promotion.  (*Id.*)  Plaintiff subsequently met with a promotion panel member to discuss ways in which he could improve his chances for promotion.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 82 *with* Dkt. No. 72, at ¶ 82.)

In March of 2006, another Deputy-Sheriff Sergeant position became available. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 84 *with* Dkt. No. 72, at ¶ 84.)  Plaintiff's score on the civil service examination was the second highest among eligible candidates.  (Dkt. No. 59, Attach. 57.) Plaintiff was not promoted.  (Dkt. No. 59, Attach. 5, at ¶ 84 *with* Dkt. No. 72, at ¶ 84.)  Instead, a candidate who's examination score was tied for third among the eligible candidates was promoted.  (Dkt. No. 59, Attach. 57.)

In May of 2006, two more positions for promotion became available.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 85 *with* Dkt. No. 72, at ¶ 85.)  Though Plaintiff's examination score was still second among eligible candidates, two of the three candidates chosen for promotion had lower scores on the examination than Plaintiff.  (*Id.*; *see also* Dkt. No. 59, Attach. 59 [Relevant Pages of Onondaga County Dept. of Personnel Cert. of Eligibles, dated May 1, 2006].)

In June of 2007, another Deputy-Sheriff Sergeant position became available.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 139 *with* Dkt. No. 72, at ¶ 139.)  Plaintiff was interviewed by the promotion panel for the position.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 140 *with* Dkt. No. 72, at ¶ 140.)[32]  During the interview, the promotion panel asked Plaintiff to discuss his supervisor's memorandum related to Ms. Holmes.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 141 *with* Dkt. No.

_____

[32]     This promotion panel was compromised of the following persons: Police Division Assistant Chief Botsford, Custody Division Chief Carbery, Assistant Chief Wasilewski, then-Lieutenant Brisson, and Captain Gonzalez.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 140 *with* Dkt. No. 72, at ¶ 140.)

72, at ¶ 141.)  Plaintiff, however, refused to do so, and was denied this promotion as well.  (*Id.*)[33]

Subsequently, Defendant Gonzalez offered Plaintiff the opportunity to discuss ways in which he

could improve his chances of being promoted, but Plaintiff refused to speak with him, and did

not ask to speak to anyone else.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 143-145 *with* Dkt. No.

72, at ¶ 143-145.)  In August 2007, another Deputy Sheriff Sergeant-Custody position became

available, but Plaintiff was not selected for the promotion.  (*Id.*)

The position of Deputy Sheriff Sergeant-Custody once again became available in October

of 2007.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 146 *with* Dkt. No. 72, at ¶ 146.)  Although

Plaintiff was not selected for the promotion, he and certain other candidates were given the

opportunity to interview for another Deputy Sheriff Sergeant-Custody position.  (*Compare* Dkt.

No. 59, Attach. 5, at ¶ 147 *with* Dkt. No. 72, at ¶ 147.)  As a result, Plaintiff and certain other

candidates re-interviewed with the promotion panel in order to (1) provide the promotion panel

with additional information not mentioned during the initial interview, and (2) advise the

promotion panel on what they had been up to since originally interviewing for the position.  (*Id.*)

At his interview, Plaintiff did not provide any additional information in support of his

qualifications for the promotion.  (*Id.*)  In December of 2007, May of 2008, and August of 2008,

eligibility lists were certified, but Plaintiff was not selected for promotion.  (*Compare* Dkt. No.

59, Attach. 5, at ¶¶ 148, 149 *with* Dkt. No. 72, at ¶¶ 148, 149.)

## E.    Plaintiff's Grievances

On April 5, 2007, Plaintiff filed a charge of discrimination with the EEOC, alleging

national-origin discrimination and retaliation.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 179 *with*

---

[33]    Though Plaintiff disputes this fact, he acknowledges that he refused to discuss the
topic any further in his deposition.  (Dkt. No. 60, Attach. 24, at 135-136.)

Dkt. No. 72, at ¶ 179.)[34]  On April 13, 2007, the EEOC issued a Dismissal and Notice of Rights letter.  (*Id.*)

In June of 2007, Plaintiff filed an internal discrimination and harassment complaint, alleging that he was discriminated against and harassed because of his national origin.  The harassment portion of the complaint concerned the 2005 written reprimand based on his submission of late time sheets, and alleged that Defendant Gonzalez lied to and harassed him. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 114, 115 *with* Dkt. No. 72, at ¶ 114, 115.)

Plaintiff met with Assistant Chief Wasilewski to discuss the complaint.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 117 *with* Dkt. No. 72, at ¶ 117.)  Assistant Chief Wasilewski asked Plaintiff to provide specific details about the allegations in order to enable him to conduct an investigation.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 118-119 *with* Dkt. No. 72, at ¶¶ 118-119.)[35]  Plaintiff, however, declined to do so, and instead requested that the matter be forwarded to the Division of Employee Relations.  (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 119-120 *with* Dkt. No. 72, at ¶¶ 119-120.)

On September 5, 2007, Plaintiff met with the Director of the Division of Employee Relations.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 121 *with* Dkt. No. 72, at ¶ 121.)  However, Plaintiff chose not to proceed any further because (1) he was disappointed, (2) he had discussed with other employees how complaints were addressed, and (3) he had already commenced litigation.  (*Id.*)

---

[34]      More specifically, Plaintiff alleged as follows: (1) he is a Brazilian male; (2) the issuance of the supervisor's memorandum following the incident with Ms. Holmes was based on lies; (3) he was not promoted because of that supervisor's memorandum; and (4) he was not promoted in retaliation for complaining about the written reprimand in 2005.  (Dkt. No. 59, Attach. 90.)

[35]      Assistant Chief Wasilewski needed more information because the written reprimand was issued when Plaintiff was under the supervision of Caption Albanese, who, at the time of the meeting, was deceased.  (*Compare* Dkt. No. 59, Attach. 5, at ¶ 118 *with* Dkt. No. 72, at ¶ 118.)

IV.     **ANALYSIS**

    A.     **Plaintiff's Claim of National-Origin Discrimination Under Title VII
Due to Issuance of Reprimand and Denial of Promotion**

As stated above in Part I.A. of this Decision and Order, Plaintiff claims that Defendants

discriminated against him based on his national origin, in violation of Title VII, by issuing him

an unjustified written reprimand (for failing to submit his time sheets) and by wrongfully

denying him a promotion to Deputy-Sheriff Sergeant on ten separate occasions.[36]  In support of

their motion, Defendants argue as follows: (1) the claims against Defendants Walsh and

Gonzalez, in their official capacity, should be dismissed; (2) Plaintiff failed to exhaust the

mandatory administrative remedies before instituting this action in federal court, and therefore

his Second-Amended Complaint should be dismissed; (3) Plaintiff's claims pursuant to Title VII

are barred by the applicable statute of limitations; and (4) Plaintiff has failed to adduce

admissible record evidence establishing a cause of action for national-origin discrimination, and

therefore this claim should be dismissed.  (Dkt. No. 59, Attach. 95, at 9.)  Based on the current

record, the Court accepts Defendants' first and fourth arguments, and therefore need not, and

does not, consider Defendants' two other grounds for dismissal.

        1.     **Plaintiff's Claims Against Defendants Gonzalez and Walsh**

"[O]fficial-capacity suits generally represent only another way of pleading an action

against an entity of which an officer is an agent."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,

691 n.55 (1978).  "To succeed on a claim against a municipal officer in their official capacity,

the plaintiff 'must still show that a [municipal] custom, policy or practice was the moving force

---

        [36]     Though Plaintiff's Second-Amended Complaint asserts that he was denied
promotions on fourteen (14) separate occasions, the record reflects only ten (10) occasions on
which Plaintiff was denied a promotion.

behind the alleged constitutional violations.'" *Carmody v. Village of Rockville Centre*, 661 F. Supp.2d 299, 329 (E.D.N.Y. 2009) (quoting *Escobar v. City of New York*, 05-CV-3030, 2007 WL 1827414, at *3 [E.D.N.Y. June 24, 2007]).  As a result, "[a] suit for damages against a municipal officer in their official capacity is the equivalent of a damage suit against the municipality itself."  *Escobar*, 2007 WL 1827414, at *3 (citations omitted).  "Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as 'redundant and an inefficient use of judicial resources.'"  *DeJean v. County of Nassau*, 06-CV-6317, 2008 WL 111187, at *5 (E.D.N.Y. Jan. 8, 2008) (quoting *Escobar*, 2007 WL 1827414) (citing cases).

Because of the foregoing, Plaintiff's claims against Defendants Gonzalez and Walsh are "merely duplicative of the action against the [County]."  *Escobar*, 2007 WL 1827414, at *3 (citing cases).  For these reasons, Plaintiff's claims against these individual Defendants are dismissed.  *See Carmody*, 661 F. Supp.2d at 329 (collecting cases).

## 2. Plaintiff's Claim Against Onondaga County

Employment discrimination claims are analyzed under the same burden-shifting framework of *McDonnell Douglas*.[37]  "To establish a *prima facie* case of employment discrimination under Title VII and the ADEA, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination."  *Deluca v. Bank of*

---

[37]    *See, e.g., Hurd v. New York City Health & Hosp. Corp.*, 07-CV-1250, 2008 WL 5120624, at *1 (2d Cir. Dec. 8, 2008).

*Tokyo-Mitsubishi UFJ, Ltd.*, 06-CV-5474, 2008 WL 857492, at *5 (S.D.N.Y. Mar. 31, 2008)

(citing, *inter alia*, *McDonnell Douglas v. Green*, 411 U.S. 792, 802 [1973]).[38]

"If the plaintiff meets his minimal burden of establishing a *prima facie* case, the burden

of production then shifts to the defendant to offer a legitimate, nondiscriminatory rationale for

the adverse employment action." *Deluca*, 2008 WL 857492, at *5 (citations omitted). "If the

defendant articulates a legitimate reason for the action, the presumption of discrimination raised

by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the

proffered reason was not the true reason for the employment decision and that the plaintiff's

membership in a protected class was." *Id.* (citations omitted). "The ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the plaintiff

remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

253 (1981).

### a.    Written Reprimand

On February 15, 2005, progressive discipline was sought against Plaintiff for failing to

submit his time sheets in violation of Part 1.1 and 1.11 of the OCSO Duty Manual.  Plaintiff

previously received instruction on submitting his time sheets in accordance with OCSO policy,

and received a supervisor's memorandum indicating that his failure to properly submit his time

sheets in the future would result in progressive discipline.

Plaintiff argues that the written reprimand was issued in a discriminatory manner based

on the fact that (1) "no other deputy had ever received a written reprimand for receiving time

---

[38]      "The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as 'minimal' and 'de minimis.'" *Zhao v. State Univ. of New York*, 472 F. Supp.2d 289, 307 (E.D.N.Y. 2007) (citing *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 [2d Cir. 2001]).

sheets late," (2) "other deputies . . . were similarly situated [to him,] but [he] was the only one of

Brazilian nation[al] origin," and (3) the written reprimand was issued, pursuant to OCSO policy,

at the time that he elected to pursue arbitration, resulting in his "[attending] arbitration guilty as

charged."  (Dkt. No. 60, at 12, 17, 18.)

    As an initial matter, it is undisputed that Plaintiff is able to satisfy the first three prongs of

his *prima facie* case for discriminatory discharge under the *McDonnell Douglas* analysis.

Having said that, the Court finds that he has failed to establish a *prima facie* case of

discrimination arising from Defendants' issuance of a written reprimand based on his failure to

comply with OCSO's policy regarding time sheet submissions.  Instead, Plaintiff has merely

alleged, in conclusory fashion, that, because "no other deputy had ever received a written

reprimand for receiving time sheets late," and he was the only deputy of Brazilian decent, his

receipt of the written reprimand must have been because of his national origin.  This is not

enough.[39]

---

[39]     The Court is mindful of the fact that "[a] showing of disparate treatment–that is, a
showing that an employer treated plaintiff 'less favorably than a similarly situated employee
outside his protected group'–is a recognized method of raising an inference of discrimination for
the purposes of making out a *prima facie* case."  *Mandell v. County of Suffolk*, 316 F.3d 368, 379
(2d Cir. 2003).  However, "[a] plaintiff alleging discrimination based on disparate disciplinary
treatment must demonstrate, in applying the *McDonnell Douglas* test, that he was subject to an
adverse employment action 'and that a similarly situated employee not in the relevant protected
group received better treatment.'"  *Carter v. New Venture Gear, Inc*., 310 F. App'x 454 (2d Cir.
Feb. 18, 2009) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 [2d Cir. 2001]).  "When
considering whether a plaintiff has raised an inference of discrimination by showing that he was
subjected to disparate treatment, . . . the plaintiff must show he was 'similarly situated in all
material respects' to the individuals with whom he seeks to compare himself."  *Graham*, 230
F.3d at 39 (citing *Shumway v. United Parcel Serv., Inc*., 118 F.3d 60, 64 [2d Cir. 1997]).  Here,
Plaintiff has merely alleged, in conclusory fashion, that he was similarly situated to the
individuals with whom he seeks to compare.  This is not enough.  *See Pergament v. Fed. Express
Corp*., 03-CV-1106, 2007 WL 1016993, at *9 (E.D.N.Y. Mar. 30, 2007) ("Notwithstanding
success on the first three prongs, however, the Court finds that Worthy is unable to make out the
fourth element [of a *prima facie* case] because she has not shown that her final warning letter and
termination occurred under circumstances giving rise to an inference of discrimination on the

Moreover, even assuming, for the sake of argument, that Plaintiff has established a *prima facie* case of discrimination, the Court finds that Defendants have articulated a legitimate, non-discriminatory basis for their actions.  More specifically, Defendants have introduced evidence of the following: (1) the timely submission of time sheets is necessary for OCSO to calculate payment for overtime and work-related incidences; (2) beginning in June 2004, the Human Resources Manager, Lieutenant Metz, began sending emails to department chiefs seeking assistance in obtaining missing time sheets from numerous employees; (3) upon receipt of this email, Chief Callisto ordered his supervisory personnel to begin issuing supervisor's memorandums for first time offenders and requests for discipline for those who had offended before; (4) Plaintiff had previously received a supervisor's memorandum regarding his submission of late time sheets in November 2003; (5) the supervisor's memorandum warned Plaintiff of the consequences of failing to timely submit time sheets in the future; (6) Plaintiff commented on the supervisor's memorandum that he would "make every effort possible to turn [the time sheets] in on time"; (7) Plaintiff subsequently failed to timely submit time sheets for the payroll period of May 29, 2004 to June 11, 2004; (8) as a result, on June 30, 2004, Sergeant Banks sent out a memorandum to Captain Albanese for progressive discipline.

---

basis of her sex or race. Worthy's allegations of racism and sexism by her superiors-and in particular, Malebranche-are, for the most part, highly conclusory and completely unsupported by record evidence.  Indeed, Worthy's 'evidence' in this respect consists primarily of her own speculation-as well as that of Mary Anne Leach . . ., a former coworker and friend-that Worthy's race and sex, and not the dismal performance of the station she supervised, must have been the 'true' reasons behind Malebranche's decision to terminate Worthy."); *Alfieri v. SYSCO Food Servs.*, 192 F. Supp.2d 14, 20 (W.D.N.Y. 2001) (observing that it is well-settled that "[f]or a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more than present conclusory allegations of discrimination . . . he or she must offer concrete particulars to substantiate the claim") (internal citations omitted).

Such record evidence establishes the following: (1) that a legitimate basis existed for issuing written reprimands for failure to timely submit time sheets; (2) that Plaintiff failed, on multiple occasions, to timely submit his time sheets prior to receiving a written reprimand; and (3) that, through a supervisor's memorandum, Plaintiff was warned of the consequences of his continued failure to timely submit his time sheets.  In addition, Defendants have introduced the following evidence, which rebuts Plaintiff's allegation that he was treated differently than were similarly situated, non-Brazilian employees: (1) Lieutenant Rys, who is a naturalized United States citizen, also received formal discipline for submitting late time sheets; and (2) progressive discipline has been sought for other individuals who have had multiple violations of the time submission policy.[40]

Furthermore, Plaintiff has failed to adduce record evidence establishing that (1) Defendants' proffered, non-discriminatory rationale is merely a pretext for discrimination, (2) the other individuals who were issued written reprimands were issued these reprimands in the same manner as was Plaintiff, and were also members of the same national origin as Plaintiff (i.e., they were treated the same as Plaintiff because they too are Brazalian), and (3) to the extent the other individuals who were issued written reprimands were non-Brazilian, they were not issued the referenced reprimands before their arbitration hearings (i.e., they received more favorable treatment than did Plaintiff).

---

[40]      In fact, Plaintiff admitted, during his deposition, that, since filing his Complaint, he has learned that (1) Sergeant Banks received a written reprimand for submitting late time sheets "many years prior" to the date that Plaintiff received his written reprimand for submitting late time sheets, and (2) at some point in time after Plaintiff received his written reprimand, Sergeant Bucci received a written reprimand for submitting late time sheets.  (Dkt. No. 59, Attach. 17, at 7.)

For these reasons, Plaintiff's claim of discrimination based on Defendants' issuance of a written reprimand arising out of Plaintiff's failure to timely submit time sheets is dismissed.[41]

### b.      Denial of Promotion

As previously stated, in order to be considered for a promotion, a candidate must have received higher than, or equal to, the third highest score on the civil service examination. Candidates meeting such qualifications are then interviewed by a promotion panel.  After the interview, the promotion panel evaluates each candidate and, based on those evaluations, submits its recommendations to Defendant Walsh.  In making its recommendations, the promotion panel evaluates candidates according to a number of factors, including, but not limited to, prior discipline, performance evaluations, supervisor's memorandums, and the candidate's performance during the interview.

Plaintiff first became eligible for a promotion on or about February 7, 2005.  Despite being eligible for a promotion on this date, as well as on nine other occasions, and despite interviewing for various promotions, Plaintiff was never promoted.  Plaintiff argues that he was repeatedly denied promotions because of his national origin.

As an initial matter, it is undisputed that Plaintiff is able to satisfy the first three prongs of his *prima facie* case for discriminatory discharge under the *McDonnell Douglas* analysis.

---

[41]      The Court does not liberally construe Plaintiff's Second-Amended Complaint as asserting a claim of discrimination based on Defendant Gonzalez's issuance of a supervisor's memorandum in response to Plaintiff's email to Melody Holmes.  However, the Court notes that, even if it were to liberally construe Plaintiff's Second-Amended Complaint as asserting this claim, it would not survive Defendants' motion for summary judgment.  This is because (1) Plaintiff has not established a *prima facie* case of discrimination with regard to this issue (for the same reasons that Plaintiff did not establish *prima facie* case of discrimination with regard to the written reprimand), and (2) Defendants have offered a non-discriminatory reason for issuing the memorandum, i.e., that a number of supervisory officials interpreted the content of the email to be inappropriate, and (3) Plaintiff has failed to adduce record evidence establishing that Defendants' proffered, non-discriminatory rationale is merely a pretext for discrimination.

Having said that, the Court finds that Plaintiff has failed to establish a *prima facie* case of discrimination arising from the promotional panel's failure to promote him on ten separate occasions.  Instead, Plaintiff has merely alleged, in conclusory fashion, that he was not promoted as a result of his national origin.  Again, this is not enough.[42]

Moreover, even assuming, for the sake of argument, that Plaintiff has established a *prima facie* case of discrimination (based on his conclusory allegation that he was treated less favorably than similarly situated, non-Brazilian employees during the interview process), the Court finds that Defendants have articulated a legitimate, non-discriminatory basis for their actions.  More specifically, Defendants' have introduced evidence of the following: (1) despite sometimes scoring higher than the individuals who were promoted, Plaintiff was not promoted because, on at least three occasions in which he was interviewed by the promotion panel, he was not ranked high enough to be recommended for a promotion;[43] (2) Plaintiff's rank was based on the shared opinion from members of the promotion panel that he did not possess the qualities necessary to be promoted;[44] (3) in making a promotion determination, Defendants do not rely exclusively on a candidate's score on the civil service examination; and (4) at least some of the members of the promotion panel were not aware that Plaintiff was a naturalized citizen (let alone an individual of

---

[42]      *See, supra,* note 39 of this Decision and Order; *see also Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("[T]he court must respect the employer's unfettered discretion to choose among qualified candidates. . . . Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.").

[43]      (Dkt. No. 59, Attach. 4, at ¶ 22 [Brisson Affid.]; Dkt. No. 59, Attach. 3, at ¶ 29.)

[44]      (Dkt. No. 59, Attach. 4, at ¶¶ 16, 19, 22-24 [Brisson Affid.]; Dkt. No. 59, Attach. 3, at ¶¶ 26, 29; Dkt. No. 59, Attach. 8, at 38-39 [Wasilweski Dep. Tr.]; Dkt. No. 59, Attach. 10, at 105-106 [Gonzalez Dep. Tr.].)

Brazilian descent).[45]

Such record evidence establishes the following: (1) there was a legitimate basis for denying Plaintiff a promotion; and (2) at least some of the promotion panel members could not have even considered denying Plaintiff a promotion based on his national origin because they were unaware that he was even a naturalized citizen.  In addition, Defendants have introduced evidence that, on more than one occasion, Plaintiff was not the only candidate not promoted who scored higher than the individuals who were promoted.[46]  This evidence rebuts Plaintiff's allegation that he was treated differently than similarly situated, non-Brazilian employees.[47]

Furthermore, Plaintiff has failed to adduce record evidence establishing either that (1) Defendants' proffered, non-discriminatory rationale is merely a pretext for discrimination, or (2) the other individuals who were not promoted, who scored higher than the individuals who were promoted, have the same national origin as Plaintiff.  Instead, Plaintiff only argues, in conclusory fashion, that it should be presumed that he was not promoted because of his national origin given that (1) Defendants had access to his personnel file (and certain individuals reviewed the file when contemplating disciplinary action or promotion), and they were therefore aware of his nationality, and (2) he was more qualified for the promotion than those promoted.[48]  Such a

---

[45]     (Dkt. No. 59, Attach. 16, at 29-31; Dkt. No. 59, Attach. 3, at ¶ 31; Dkt. No. 59, Attach. 8, at 36; Dkt. No. 59, Attach. 4, at ¶ 18.)

[46]     (Dkt. No. 59, Attach. 55, at 2; Dkt. No. 59, Attach. 57, at 2; Dkt. No. 59, Attach. 59, at 2; Dkt. No. 59, Attach. 81, at 2.)

[47]     The Court notes that there is no evidence in the record that these other eligible candidates, who were not promoted but scored higher than the individuals who were promoted, have the same national origin as Plaintiff.

[48]     Plaintiff argues that Defendants failure to produce the promotion panel's scoring and ranking of those promoted gives rise to an inference that he was more qualified than those candidates.

conclusory argument, based entirely on speculation, is not enough to withstand a motion for summary judgment. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[E]ven in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *see also Goenaga v. March of Dimes Birth Found*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.").

For these reasons, Plaintiff's claim of discrimination based on his being denied a promotion because of his national origin is dismissed.

**B.     Plaintiff's Claim of Hostile Work Environment Under Title VII Due to Verbal Harassment**

In addition to claiming that he was issued an unjustified written reprimand and wrongfully denied a promotion based on his national origin, Plaintiff claims that he was subjected to a hostile work environment based on his national origin, due to the verbal harassment by Defendants (including Defendant Gonzalez) that he experienced on multiple occasions.  In support of their motion, Defendants argue as follows: (1) the claims against Kevin E. Walsh and Esteban Gonzalez, in their official capacity, should be dismissed; (2) Plaintiff failed to exhaust the mandatory administrative remedies before instituting this action in federal court, and therefore his Second-Amended Complaint should be dismissed; (3) Plaintiff's claims pursuant to Title VII are barred by the applicable statute of limitations; and (4) Plaintiff has failed to adduce record evidence establishing his hostile work environment claim.

For the reasons stated in Part IV.A.1. of this Decision and Order, Plaintiff's claims against Defendants Gonzalez and Walsh are dismissed.  In addition, because the Court accepts Defendants' fourth argument (i.e., that Plaintiff has failed to adduce record evidence establishing

this hostile work environment claim), it need not, and does not, consider Defendants' two other

grounds for dismissal.

"To establish a claim of hostile work environment, a plaintiff must show that: (1) he or he

was subjected to harassment because of his or her membership in a protected class that was so

severe or pervasive as to alter the conditions of his or her employment; and (2) there is a specific

basis for imputing the harassment to the defendant." *Little v. Nat'l Broad. Co., Inc.*, 210 F.

Supp.2d 330, 388 (S.D.N.Y. 2002) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.

1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 118 S. Ct. 2257 (1998),

and *Faragher v. City of Boca Raton*, 118 S. Ct. 2275 (1998) [other citation omitted]).

"The test for the first prong is whether the employment environment was 'objectively

hostile'–that is, whether the environment was permeated with discriminatory intimidation,

ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Little*, 210 F. Supp.2d at 388

[citations and internal quotations omitted].  "The Supreme Court has emphasized that the

standard for judging whether a work environment is objectively hostile must be sufficiently

demanding so as to prevent Title VII from becoming a general civility code." *Little*, 210 F.

Supp.2d at 388 [internal quotation marks and citations omitted].  "Courts must distinguish

between merely offensive and boorish conduct and conduct that is sufficiently severe or

pervasive as to alter the conditions of employment." *Id*. [internal quotation marks and citations

omitted].

"In determining whether a workplace is objectively hostile, a court should look at the

totality of the circumstances." *Id*. (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 [1993]).

Factors that courts should examine include "the frequency of the discriminatory conduct, its

36

severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Forklift Sys., Inc.*, 510 U.S. at 23.  "When evaluating the 'quantity, frequency, and severity' of the incidents, the court must look at the incidents 'cumulatively in order to obtain a realistic view of the work environment.'"  *Little*, 210 F. Supp.2d at 389 (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 111 [2d Cir. 1997]).  The conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Feingold v. N.Y.*, 366 F.3d 138, 150 (2d Cir. 2004).  The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, . . . [t]he environment need not be 'unendurable' or 'intolerable.'"  *Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 [2d Cir. 2000]).  Moreover, although a hostile work environment generally consists of "continuous and concerted" conduct, "a single act can create a hostile work environment if it in fact work [s] a transformation of the plaintiff's workplace."  *Feingold*, 366 F.3d at 150 (quotations and citation marks omitted) (alternation in original).

As an initial matter, Plaintiff has failed to allege facts plausibly suggesting that the actions of Defendants–including Defendant Gonzalez–were discriminatory in nature.[49]  In any

---

[49]     For example, with regard to Defendant Gonzalez's actions, Plaintiff's Second-Amended Complaint specifically alleges as follows: (1) on July 26, 2006, Sergeant Banks served him with a Supervisor's Memorandum, on the orders of Defendant Gonzalez, which "reprimand[ed] and chastis[ed] [him] for unprofessional conduct" stemming from Plaintiff's email exchange with Melody Holmes; (2) Sergeant Banks told Plaintiff that Defendant Gonzalez stated that Plaintiff was "condescending" to Holmes; (3) "several months later," during a meeting with Banks and Gonzalez, Plaintiff asked Gonzalez to retract the Supervisor's Memorandum, but he refused, and "further commented that in addition to being[] 'condescending,' [Holmes] said [he] was 'abrasive'"; (4) Gonzalez order Plaintiff not to communicate with Holmes; (5) "a week or so later," Banks told Plaintiff that Gonzalez did not want Plaintiff "writing anything down about the meal times" on the Ramadan list; (6) on December 8, 2006, Plaintiff "unexpectedly met [Holmes,]" who told Plaintiff that she "never

event, even assuming, for the sake of argument, that Plaintiff has alleged facts plausibly

suggesting the actions in question (e.g., the hearsay statements about what an employee told

Plaintiff that Gonzalez said, or what Gonzalez told Plaintiff that Melody Holmes said) were

discriminatory in nature, Plaintiff has failed to adduce admissible record evidence establishing

he was subjected to conduct that was so severe or pervasive as to alter the conditions of his

employment.  For example, Plaintiff has not adduced admissible record evidence establishing

that the incidents (1) were caused by his national origin, (2) were frequent, (3) were objectively

severe, (4) were physically threatening, or (5) otherwise unreasonably interfered with his ability

to work.

For these reasons, Plaintiff's hostile work environment claim is dismissed.

### C.      Plaintiff's Claim of Retaliation Under Title VII Due to Issuance of Reprimand and Denial of Promotion

As stated above in Part I.A. of this Decision and Order, Plaintiff claims that Defendants

violated his rights under Title VII by issuing him an unjustified written reprimand and by

wrongfully denying him a promotion to Deputy-Sheriff Sergeant, in retaliation for his filing

grievances and appeals, seeking arbitration, and filing a complaint with the EEOC regarding the

written reprimand.  Plaintiff also claims that he was issued an unjustified written reprimand and

wrongfully denied a promotion in retaliation for his wife's involvement in federal district court

proceedings, as well as her participation in disciplinary hearings involving other deputies.

---

thought [he was] condescending or abrasive[, and] never said anything in that manner to
Gonzalez"; (7) "in January or February of 2007," Gonzalez had a co-worker call Plaintiff at
home about "stats" for the annual report for 2006; and (8) on or about June 21, 2007, Plaintiff
was interviewed for a promotion, and during the interview, which Gonzalez was present for,
then-Lieutenant Brisson asked Plaintiff "about the supervisor's memorandum [he] received for
responding by email to [Holmes]."  (Dkt. No. 35.)

In support of their motion, Defendants argue that Plaintiff's retaliation claim should be dismissed because (1) Plaintiff cannot establish that he was participating in a statutorily protected activity, and (2) Plaintiff cannot establish a causal connection between the protected activity and the adverse employment action.  (Dkt. No. 59, Attach. 95, at 14-19.)  Based on the current record, the Court accepts a majority of Defendants' first argument, as well as the entirety of Defendants' second argument.

In adjudicating retaliation claims, courts follow the *McDonnell Douglas* burden-shifting approach.  *Kaytor v. Elec. Boat Corp*., 609 F.3d 537, 552 (2d Cir. 2010) (citations omitted).  "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action."  *Kator*, 609 F.3d at 552-53 (citations omitted).  "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action."  *Id*. at 553 (internal quotation marks and citations omitted).

"In order to establish a *prima facie* case of retaliation, [a plaintiff] must show (1) that []he participated in an activity protected by Title VII, (2) that h[is] participation was known to h[is] employer, (3) that h[is] employer thereafter subjected h[im] to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action."  *Kaytor*, 609 F.3d at 552 (2d Cir. 2010) (citations omitted).  "'Protected activity' refers to an action taken to protest or oppose statutorily prohibited discrimination."  *Berry v. Empire Homes Servs. LLC*, 06-CV-2354, 2010 WL 1037948, at *10 (E.D.N.Y. Mar. 18, 2010) (citing 42 U.S.C. §§ 2000e-3).

Plaintiff alleges that he engaged in the following protected activity, for which he was retaliated against: (1) on February 15, 2005, he filed a grievance in response to being issued a written reprimand for failing to timely submit time sheets; (2) in or about August 2005, he proceeded to arbitration regarding this incident; (3) on August 4, 2006, he filed a grievance over the supervisor's memorandum issued for the email that he sent to Ms. Holmes; and (4) on or about April 5, 2007, he filed a charge of discrimination with the EEOC.

Plaintiff also alleges that his wife engaged in the following protected activity, for which he was retaliated against: (1) in 1997, roughly seven years before marrying Plaintiff, his wife brought a lawsuit against the County of Onondaga based on alleged gender discrimination by Sergeant O'Dell (whom the County terminated shortly after she filed her Human Rights Complaint), which she ultimately discontinued; (2) in 2003, his wife reported to her supervisor that she smelled alcohol on a deputy's breath, and, based on an arbitrator's finding that the complaint was without merit and that a public apology was necessary, on March 10, 2005, Assistant Chief Wasilewski issued a public apology to the deputy; and (3) in 2006, Plaintiff's wife was subpoenaed to testify in a federal lawsuit filed by Deputy Veronica Casolare against the County of Onondaga and Sergeant O'Dell, but she never testified because the case settled.[50]

As an initial matter, only two of the above-described actions were taken to protest or oppose statutorily prohibited discrimination: (1) Plaintiff's filing of his EEOC complaint;[51] and

---

[50]     A review of the docket sheet in *Casolare v. Onondaga County*, 00-CV-1500 (N.D.N.Y.) reveals the following: (1) the subpoena was issued sometime in 2006; and (2) the case settled on December 12, 2006.

[51]     *See, e.g., Holder v. City of Yonkers*, 04-CV-10314, 2006 WL 1582081, at *6 (S.D.N.Y. June 7, 2006) (noting that the filing of a charge of employment discrimination with the EEOC constitutes protected activity).

(2) Plaintiff's wife's complaint of gender discrimination in 1997.[52]  As a result, to the extent that

Plaintiff's retaliation claim arises out of any of the other above-identified issues, the claim is

dismissed.[53]

Moreover, with regard to Plaintiff's wife's complaints of gender discrimination, the

Court finds that, under the circumstances, those complaints do not give rise to a Title VII

retaliation claim on behalf of Plaintiff.  For the sake of much-needed brevity, the Court will

assume that "third-party retaliation claims" under Title VII are cognizable, despite the existence

of well-reasoned authority to the contrary.[54]  Even assuming that a third-party's engagement in

protected activity may constitute protected activity by a plaintiff for purposes of a Title VII

retaliation claim, the Court finds that no rational juror could find, based on the current record,

that the protected activity engaged in by Theresa Spaulding gave rise to the Title VII retaliation

claim asserted by Plaintiff in this action.  The Court makes this finding for three reasons: (1)

Plaintiff was not married to Ms. Spaulding at the time that she complained of gender

discrimination; (2) approximately eight years elapsed from Ms. Spaulding's filing of the

complaint (in 1997) and Plaintiff's experience of adverse action (in 2005); and (3) legitimate

----

[52]     *See, e.g., Bampoe v. Coach Stores, Inc.*, 93 F. Supp.2d 360, 372 (S.D.N.Y. 2000) (noting that, under Title VII, even informal complaints about discrimination, such as complaints to management, constitute protected activities); *but see Ebanks v. New York City Dept. of Environmental Protection*, 05-CV-3172, 2009 WL 891796, at *7 (E.D.N.Y. Mar. 31, 2009) ("The filing of a union grievance . . . is not a 'protected activity' under Title VII and, therefore, cannot form the basis for a Title VII retaliation claim.").

[53]     The Court notes that, with regard to Plaintiff's wife's involvement in the *Casolare* lawsuit, without more, the fact that she was (1) mentioned in a Decision and Order denying the defendants' motion for summary judgment, and (2) subpoenaed to testify, does not constitute engagement in "protected activity."  In fact, being mentioned in a decision and ordered to provide testimony does not constitute "activity" of any sort.

[54]     *See Genao v. New York City Dep't of Parks*, 04-CV-2893, 2005 WL 1220899, at *5-6 (E.D.N.Y. May 23, 2005) (collecting cases on both sides, noting that "the Second Circuit has not addressed the question of third-party retaliation claims under Title VII").

grounds existed warranting the adverse action taken against Plaintiff.  Simply stated, these three

facts render implausible the alleged causal connection between the two events in question.[55]

Finally, with regard to Plaintiff's filing of his EEOC complaint on or about April 5, 2007,

the Court finds that Plaintiff has made out a *prima facie* case of retaliation.  This is because,

subsequent to April 5, 2007, Plaintiff was denied promotions (specifically in June of 2007,

October of 2007, December of 2007, May of 2008, and August of 2008).[56]  However, the Court

has already found, in Part III.A. of this Decision and Order, that Defendants have satisfied their

burden of demonstrating a legitimate, *non-discriminatory* reason for denying Plaintiff promotion

opportunities.  For this same reason, the Court finds that Defendants have articulated a

legitimate, *non-retaliatory* reason for denying him promotion opportunities.[57]  As a result, the

burden shifts to Plaintiff to demonstrate that Defendants' proffered non-retaliatory reason for

denying him a promotion in June of 2007, October of 2007, December of 2007, May of 2008,

and August of 2008 was pretextual, and that retaliation was a substantial reason for the adverse

employment action.

---

[55]     *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close[.]' Action taken (as here) 20 months later suggests, by itself, no causality at all.").

[56]     *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004) ("A tangible employment action . . . constitutes a significant change in employment status, such as . . . failing to promote . . . ." [internal quotations and citations omitted]).

[57]     *See Simpson v. New York State Dep't of Civil Serv.*, 02-CV-1216, 2005 WL 545349, at *20 (N.D.N.Y. Mar. 1, 2005) (McCurn, J.) ("As it did in connection with plaintiff's discrimination claim, and for substantially the same reasons, the court finds that the Department has met its burden of articulating a legitimate, non-retaliatory reason for terminating plaintiff. . . . The burden thus shifts back to plaintiff Simpson to establish pretext."); *Reznick v. Aramark Corp.*, 97-CV-18977, 1999 WL 287724, at *13 (E.D.N.Y. May 5, 1999) (noting that defendant's non-discriminatory reasons for adverse action also established non-retaliatory reasons for adverse action).

"A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, . . . or when there were other objectively valid grounds for a discharge." *Rainola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (citations omitted). However, "[a] retaliatory motive must be . . . 'at least a 'substantial' or 'motivating' factor behind the adverse action." *Rainola*, 243 F.3d at 625 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [1977]) (other citation omitted). As the Second Circuit has explained, "[a] plaintiff may prove retaliation was a substantial or motivating fact behind an adverse employment action either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similarly conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id*. (internal quotation marks and citation omitted). "Under some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's *prima facie* case, by sufficient proof to rebut the employer's proffered reason for the [adverse action]." *Id*. (citation omitted). However, "[t]emporal proximity, standing alone, is insufficient to carry plaintiff's burden at step three[, the pretext element.]" *Pellegrino v. County of Orange*, 313 F. Supp.2d 303, 316 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).[58]

---

[58]     *See also Hines v. Hillside Children's Ctr.*, 73 F. Supp.2d 308, 323-24 (W.D.N.Y. 1999) (noting that "[i]t is true that a 'strong temporal correlation' between an employee's protected activity and an adverse job action can constitute some evidence of a retaliatory motive," but holding that temporal proximity was not enough to establish pretext for retaliation); *Vails v. Police Dep't of the City of New York*, 54 F. Supp.2d 367, 378 (S.D.N.Y. 1999) (finding a one-day difference between complaint and termination a "coincidence" and therefore insufficient); *Valentine v. Standard & Poor's*, 50 F. Supp.2d 262, 291 (S.D.N.Y. 1999) ("Despite the temporal correlation between plaintiff's filing of the EEOC charge and his termination, he has failed to establish that S & P's proffered reason for dismissing him, his misconduct, was false and that unlawful retaliation was the true reason for his discharge.")

Here, Plaintiff has failed to adduce any evidence establishing that a retaliatory motive was a substantial or motivating factor behind the adverse action.  For example, other than temporal proximity, Plaintiff has not adduced other circumstantial evidence, such as disparate treatment of fellow employees who engaged in similar conduct.  Nor has he adduced direct evidence of retaliatory animus directed against him by Defendants (or one of his supervisors).

For each of these reasons, Plaintiff's Title VII retaliation claim is dismissed.

**D.      Plaintiff's Claim of Denial of Right to Free Speech Under 42 U.S.C. § 1983 and First Amendment**

As stated in Part I.A. of this Decision and Order, Plaintiff claims that Defendant Gonzalez unjustifiably suppressed his speech, in violation of 42 U.S.C. § 1983 and the First Amendment.  In support of their motion, Defendants argue that Plaintiff's Section 1983 claim should be dismissed because (1) "the speech alleged to have been curtailed was made pursuant to Plaintiff's position as a public employee, and was well within the discretion of the County . . . its Sheriff's Office[,] and its employees to restrict[,]" and (2) even assuming that Plaintiff is able to establish that Defendant Gonzalez violated his right to free speech, because this claim is brought against Defendant Gonzalez in his official capacity, the claim is actually a claim of municipal liability against the County, and Plaintiff has failed to establish the existence of a custom or policy.  Based on the current record, the Court accepts Defendants' arguments.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  However, the First Amendment does not protect public employees' speech when made pursuant to their official duties.  *See Garcetti*, 547 U.S. at 421 (noting that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. . . [,] [i]t simply

reflects the exercise of employer control over what the employer itself has commissioned or created").

In determining whether a public employee is entitled to constitutional protections for his or her speech, a court must embark on two separate inquiries. *Garcetti,* 547 U.S. at 418. "The first requires determining whether the employee spoke as a citizen on a matter of public concern." *Id.* (citations omitted). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* (citation omitted). "If the answer is yes, then the possibility of a First Amendment claim arises." *Id.* "The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citation omitted).

Here, Plaintiff alleges that Defendant Gonzalez violated his free speech rights when he told Plaintiff not to have further contact with Melody Holmes, and told a co-worker of Plaintiff's to tell Plaintiff to remove the remarks Plaintiff made regarding mealtimes on the inmate Ramadan meal registration list. Clearly these are not maters of public concern. Rather, they relate to restrictions of Plaintiff's work-related speech.

In addition, the Court agrees with Defendants that, because Plaintiff has brought this claim against Defendant Gonzalez in his official capacity, the claim is actually a claim of municipal liability against the County. Furthermore, Plaintiff has failed to allege facts plausibly suggesting a custom or policy of suppressing employee speech, let alone adduce record evidence establishing the existence of a custom or policy of suppressing employee speech.[59]

For these reasons, Plaintiff's free-speech claim is dismissed.

---

[59]    Similarly, Plaintiff has failed to allege facts plausibly suggesting a custom or policy of retaliating against employees for engaging in protected activity, let alone adduce record evidence establishing the existence of a custom or policy of retaliation based on engagement in protected activity. As a result, to the extent that Plaintiff's Second-Amended Complaint can be liberally construed to assert a claim of retaliation against Onondaga County under 42 U.S.C. § 1983 (Plaintiff's claims against Defendants Walsh and Gonzalez are brought against them in their official capacity), that claim is also dismissed.

**E.      Plaintiff's Cross-Motion to File a Third-Amended Complaint**

As an initial matter, the Court rejects Plaintiff's request for leave to file a Third-Amended Complaint, because that request was already considered and denied by Magistrate Judge Peebles.  (*See* Text Minute Entry for 2/17/09.)  Plaintiff never filed an appeal from that denial, and the deadline in which to do so has expired.

Moreover, Plaintiff's request was submitted, not as a proper motion, but merely as an argument raised in his response memorandum of law.  As a result, Plaintiff's request is unaccompanied by an affidavit, a specific identification of the proposed amendments, and a copy of the proposed amended pleading, as required by the Local Rules of Practice for this Court.  *See* N.D.N.Y. L.R. 7.1(a)(4) (noting that "[a] party moving to amend a pleading pursuant to Fed. R. Civ. P. 14, 15, 19-22 must attach an unsigned copy of the proposed amended pleading to its motion papers").[60]

Furthermore, Plaintiff's request is not contained in a response to a *motion to dismiss for failure to state a claim* (which typically occurs relatively early in an action), but in a response to a *motion for summary judgment*.  As a result, Plaintiff's request was filed nearly one year and ten months after the signing of his Complaint, and more than three months after the conclusion of discovery.  (*See generally* Docket Sheet.)  Simply stated, permitting Plaintiff to drastically change the landscape of his claims at such a late stage of the action would unduly prejudice Defendants, who spent the time and expense of filing two comprehensive and lengthy motions for summary judgment on the claims asserted in Plaintiff's Second-Amended Complaint, and

---

[60]      The Court notes that, on January 2, 2008, Plaintiff filed a motion to amend his Complaint, and attached to his motion a proposed Amended Complaint.  (Dkt. No. 26.) Although the Court initially rejected the proposed Amended Complaint (Dkt. No. 34), it is clear that Plaintiff was aware of the requirement that he file a motion to amend his Complaint and attach his proposed Amended Complaint in order for the Court to consider the relief requested.

who would not have the benefit of conducting discovery on such new claims before trial.[61]

In any event, even if the Court were to overlook these flagrant procedural errors, the Court would nonetheless deny Plaintiff's request on grounds of futility.  This is because there is no evidence in the record from which a rational factfinder could conclude that Onondaga County, through its policymaking officials,[62] had (or has) a custom or policy of denying individuals (1) their due process rights when such individuals sought (or seek) to challenge the issuance of written reprimands and/or the denial of promotions, or (2) their equal protection right to be treated in the same manner as all other similarly situated individuals (or that such differential treatment was (or is) based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person).  To the contrary, the record evidence adduced by the parties establishes that Onondaga County, through the OCSO, has express anti-harassment, anti-discrimination, and anti-retaliation policies.  In addition, OCSO maintains internal procedures for aggrieved employees to seek redress for conduct that is discriminatory, harassing, and/or retaliatory.

For each of these alternative reasons, Plaintiff's cross-motion to file a Third-Amended Complaint is denied.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED** in its entirety; and it is further

---

[61]    *See Matiyn v. Allen*, 06-CV-1503, Decision and Order, at 8-9 & n.9 (N.D.N.Y. Sept. 28, 2010) (Suddaby, J.) [collecting cases].

[62]    In order for a municipality to be liable pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), the conduct causing the plaintiff's injury must have occurred pursuant to "policy or custom, . . . made by [the municipality's] lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell*, 436 U.S. at 694.

**ORDERED** that Plaintiffs' Second-Amended Complaint (Dkt. No. 35) is **<u>DISMISSED</u>**

with prejudice in its entirety.  The clerk is directed to enter judgment in favor of the defendants

and close this case.

Dated: September 30, 2010
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge